## Wytheville.

## VANDENBERGH & HITCH, INC., AND OTHERS v. BUCK-INGHAM APARTMENT CORPORATION.

### June 11, 1925.

Argued before Judge Chichester took his seat.

1. REAL ESTATE BROKERS—*Action for Commissions—Purchaser Declining to Complete the Sale because of Innocent Misrepresentations by Broker—Case at Bar.*—In the instant case, an action by brokers to recover commissions for the sale of an apartment house, the defendant contended, and the evidence bore him out, that the proposed purchaser had declined to complete the purchase because the brokers had not informed him that the rental contracts of the apartments were subject to certain rebates, and had informed him that the interest and curtails upon a mortgage upon the building which he was to assume were payable semi-annually, whereas in fact they were payable monthly, and that negotiations were broken off because the purchaser would not "stand for" the rebates in the rent and the monthly payment of interest and curtails.

   *Held:* That if this were all, plaintiffs were clearly not entitled to recover.

2. REAL ESTATE BROKERS—*Action for Commissions—Purchaser Declining to Complete the Sale because of Innocent Misrepresentations by Broker—Case at Bar.*—In the instant case, an action by brokers for commissions upon the sale of an apartment house, defendant contended that the sale had fallen through because the brokers had not informed the purchaser that the rental contracts of the apartments were subject to certain rebates, and that the interest and curtails upon a mortgage upon the building were payable monthly and not semi-annually. Plaintiffs, however, insisted that the owner of the building agreed to take care of the rebates and that purchaser agreed to accept the building with the interest and curtails payable monthly.

   *Held:* That if these facts were shown, then the differences between the parties were adjusted, and the plaintiffs were entitled to recover.

3. NEW TRIALS—*Conflicting Evidence—Finding of Jury not to be Disturbed.*—In an action by a real estate broker for commissions upon the sale of an apartment house, the broker admitted that he did not inform the purchaser that the rentals of the apartment were subject

to certain rebates, but testified that the owner had agreed to take care of these rebates. The owner was the only person present at the conversation between him and the broker, in which the broker alleged that he agreed to take care of the rebates, and the owner positively denied any such agreement.

*Held:* That this constituted a conflict to be decided by the jury, and as the jury found for the broker, the trial court had no power or right to interfere with its findings.

4. REAL ESTATE BROKERS—*Action for Commissions—Verdict for Brokers—Verdict Set Aside as Contrary to the Evidence—Case at Bar.*—In the instant case, an action by real estate brokers for commissions on the sale of an apartment house, it was conceded that the brokers had innocently misrepresented to the purchaser that the payments of interest and sinking fund upon a mortgage upon the building were semi-annual, whereas in fact they were monthly. The purchaser consistently refused to make such payments, or to accept the property subject to certain rebates on the rentals of the apartment, of which he was not informed. The broker had knowledge of the purchaser's position, and he failed to mention to any one an alleged waiver by the purchaser of his objection to the monthly payments of interest and sinking fund, which waiver was denied by the purchaser.

*Held:* That a verdict for the plaintiff was plainly contrary to the evidence, and that the trial court committed no error in setting it aside and entering judgment for the defendant.

5. REAL ESTATE BROKERS—*Action for Commissions—Verdict for Brokers—Verdict Contrary to the Evidence.*—In an action by real estate brokers for commissions on the sale of an apartment house, it appeared that the sale fell through because the purchaser refused to accept the building because the rents of the apartments were subject to certain rebates, and the interest and sinking fund upon the mortgage on the building were payable monthly instead of semi-annually, as represented by the brokers. The brokers contended that the owner had agreed to take care of the rebates and that the purchaser waived his objection to the monthly payments of interest and sinking fund. But if this were true, there were no longer any points of difference between the parties, and the sale would have been completed. The waiver attributed to the purchaser was never mentioned at any of the numerous conferences held on the subject.

*Held:* That the waiver was contradicted by every fact and circumstance of the case.

6. APPEAL AND ERROR—*New Trial—Sections 6251 and 6363 of the Code of 1919.*—While perhaps, on a demurrer to the evidence by the defendant in an action by a broker against an owner for commissions, the court might be compelled to accept the broker's statement of a waiver by the purchaser of his objection to accepting the building,

yet under sections 6251 and 6363 of the Code of 1919, such statement need not be accepted by the court, when to do so would strain the credulity of the court to the breaking point, and require the entry of a judgment contradicted by every other fact and circumstance of the case, in conflict with the testimony of numerous witnesses of high character, and manifestly against right and justice. It is extreme cases of this sort that the statute was enacted to meet.

7. REAL ESTATE BROKERS—*Action for Commissions—Where Owner Could Not Maintain Specific Performance against Purchaser or an Action for Damages.*—Where in an action for commissions by a real estate broker against the owner of property, the owner could not have successfully maintained against the proposed purchaser either a suit for specific performance or an action for damages, by reason of the misrepresentations of the broker to the proposed purchaser, however innocently made, the broker could not be allowed a recovery for securing a contract which was unenforceable. The broker never produced a purchaser ready, able, and willing to purchase on the owner's terms.

Error to a judgment of the Circuit Court of the city of Norfolk, in an attachment proceeding. Judgment for defendant. Petitioners assign error.

*Affirmed.*

The opinion states the case.

*Jas. G. Martin & Bro.*, for the plaintiffs in error.

*E. R. F. Wells*, for the defendant in error.

BURKS, J., delivered the opinion of the court.

The plaintiffs in error were real estate brokers and brought this action to recover commissions for the sale of the Buckingham apartments. There was a verdict for the plaintiffs for $4,300.00 which the trial court set aside and entered judgment for the defendant. The sole ground on which the trial judge set aside the verdict was because he was "unable to find evidence sufficient to support the verdict."

The subject of sale was an apartment house, then recently constructed and largely occupied by tenants. At the time of the sale the rental contracts called for $1,660.00 per month, or approximately $20,000.00 per year. The house when full had a rental value of $24,000.00 per year. These facts were so represented to the purchaser. There was a mortgage on the house for $95,000.00, carrying interest at seven per cent, payable semi-annually, and certain portions of the principal were payable annually beginning July 1, 1924. Of this fact the purchaser was also informed. But the rental contracts were subject to certain rebates amounting, in the aggregate, to about $1,500.00 per annum, and the mortgage contained the following clause:

"And as a further security and provision for the payment of said bonds, the said Buckingham Apartment Corporation covenants to assign to the said trustees, to be applied to the payment of interest on all of said bonds, and to the principal of such of said bonds as fall due during the respective years ending July 1st, so much of the rents derived from the said property to be paid to said trustees on the 15th day of each month in equal monthly installments as may be necessary to pay the said interest and the said principal falling due during each respective year ending July 1st, as aforesaid."

The purchaser had not been informed of the rebate in the rents, or of the clause in the mortgage above quoted at the time he entered into his contract of purchase. The contract of purchase was in the form of an offer by the purchaser and acceptance by the owner in the following words and figures:

"Norfolk, Va., Dec. 11, 1922.
"Mess. Vandenbergh & Hitch, Inc.,
    "Dickson Bldg., Norfolk, Virginia.
"Gentlemen:
    "I hereby agree to purchase the Buckingham apartment, at the southwest corner of Brandon avenue and West Ghent boulevard, for the sum of $140,000.00. I agree to stand one half of the excess above six per cent interest on the $95,000.00 mortgage from January 1, 1923, to July 1, 1932. The said property to be turned over to me in the present condition with all material that is now on the site. All rentals to be turned over to me on January 1, 1923. Said property to be free of all liens.

"The said $140,000.00 is to be paid as follows: assume the first deed of trust of $95,000.00, give a deed to my property number 232 west 30th street, free of liens, which is valued at $18,000.00, and pay in cash $27,000.00 less the difference in interest above mentioned.

"This offer must be accepted by 11:00 A. M. December 12, 1922."
                    "Very truly yours,
                        "(Signed) J. Johnson."

"Norfolk, Va., December 12th.
"10:30 A. M.
    "I hereby agree to accept the above offer, Buckingham Apartment Company.
                "By (Signed) R. C. Hogue, Pres."

R. C. Hogue was president and treasurer of the Buckingham Apartment Corporation, and owned ninety-eight per cent of its capital stock. Jesse Johnson, the purchaser, was ready, able and willing to buy the property at the price mentioned, if the facts in relation thereto had been as represented to him by the

brokers. There were several meetings of the parties and their counsel and the brokers to close the sale on December 12th, 13th and 14th. The details of these meetings need not be given further than to say that all negotiations were broken off and Johnson definitely refused to take the property on December 14th, because he would not "stand for" the rebates in the rents, which would cause him a loss of about $1,500.00, and the monthly payment of interest and curtails, which would cause him a loss of about $3,500.00. Dr. Hogue refused to "stand for" or make good either of these losses and insisted upon the performance of the contract *as written*. Johnson insisted on performance *as represented*. At this stage, the parties being unable to agree, negotiations were broken off.

[1-3] If this were all, the plaintiffs were clearly not entitled to recover. But the plaintiffs insist that Dr. Hogue agreed to take care of the rebates, and that Johnson "agreed to accept it with the interest and curtail payable monthly." If these facts were shown, then the differences between the parties were adjusted, and the plaintiffs were entitled to recover.

There was also some evidence tending to show that Dr. Hogue agreed to make up the difference between monthly and semi-annual payment, but it is too vague and indefinite to be of value.

On the subject of the rebates of rents, Vandenbergh, one of the plaintiffs, who conducted most of the negotiations, admits that he did not inform Johnson of the rebates, but gives as his reason for not so doing that "Dr. Hogue had agreed to take care of these rebates." Again, "I left Dr. Hogue with the understanding and positive statement by him that he was going to take care of those rebates out of the cash when the deal was settled. That was our understanding in the matter." Further, on this subject, he was interrogated and answered as follows:

"Q. That he, Dr. Hogue, or the Buckingham Apartment Corporation, which?

"A. That the Buckingham Apartment Corporation was going to take care of the rebates out of it. I told him he could not expect anybody to buy any building with a lot of leases and rebates on it, and after the man bought it he would wake up and find out that he was getting less rent than the leases called for.

"Q. Did you communicate that to Mr. Jesse Johnson?

"A. I told Mr. Johnson that when he told me that Dr. Hogue had said he had told me what those rebates amounted to. I didn't tell him that when we were making those negotiations.

"Q. Did Mr. Johnson agree to that disposition of the matter?

"A. Nothing was said to him about it because there was no question about it. Dr. Hogue was going to take care of them, therefore, Mr. Johnson would have been satisfied.

"Q. How do you know he would have been satisfied?

"A. He would have been satisfied to get his $1,600.00 a month rent out of it.

"Q. And he would have been satisfied with Dr. Hogue's verbal promise that he would pay back the rebates?

"A. There was not going to be any verbal promises. They were going to be paid when they settled. He led me to think it was a very small amount."

Mears, another of the plaintiffs who was present with Vandenbergh, testified as follows:

"Q. What transpired then?

"A. We went into the thing in detail and Dr. Hogue told us—took his leases out—that there was some little difference in the rental, which matter he wanted to

adjust himself. That was brought up by his stating-
that he wanted the rentals to stay in the hands of Mr.
Hecht, who was then the rental agent for the building.
We told him that Mr. Johnson's son wanted to handle-
the rentals, or that Mr. Johnson wanted his son to and.
asked him to turn them over, and he insisted that they
remain in Mr. Hecht's hands for that reason, so that.
he could better take care of these little differences in.
the leases he refers to. Shortly after that conversation:
that morning he signed the contract and we hustled'
down to Mr. Johnson's office because we had very little-
time to make our delivery and still be in the limit.

"Q. Before you left Dr. Hogue that morning did he,.
or not, consent to stand the difference in the rent?

"A. He did."

Dr. Hogue, the only other person present at this-
conversation, positively denied any such undertaking-
or agreement. This constituted a conflict to be de--
cided by the jury. On this question, the jury found.
for the plaintiffs, and the trial court had no power or-
right to interfere with its findings.

On the subject of the monthly payment of interest.
and sinking fund to meet the annual payment of prin-
cipal, Vandenbergh admits that he represented to-
Johnson that the interest was payable semi-annually
and he thought such was the fact. This is admitted
by him to have been a misrepresentation, and Johnson
was under no obligation to go to the record to verify-
his statement. He testified positively, however, that
Johnson agreed to take the property with the monthly-
payments. His testimony on the subject was as
follows:

"Q. Did Mr. Johnson state in your presence that he-
would not take the property on account of this interest
and sinking fund being payable in monthly installments-
instead of semi-annually? ⸳

"A. He agreed to accept it with the interest and curtail payable monthly.

"Q. He did?

"A. Yes.

"Q. When?

"A. At a meeting we had perhaps the—we had a meeting on the 12th. It was perhaps the day after, or the second day after this contract was signed by Dr. Hogue.

"Q. And Mr. Johnson, Mr. Jesse Johnson, then agreed to waive that?

"A. Yes, sir.

"Q. Who was present when he agreed to that?

"A. I don't know whether anybody except Mr. Johnson and myself and maybe Mr. Mears was there. I don't recall whether he was or not. Maybe Mr. Johnson's son was there.

"Q. Then, you mean to say that in the presence of Dr. Hogue, two days after this acceptance of this offer, Mr. Johnson, in your presence, and in the presence of your friend, Mr. Mears, said he would take the property notwithstanding the fact that interest and sinking fund were payable in monthly installments?

"A. Yes. We had some little talk about that. It was the first I found out that the interest and curtails were payable monthly, and Mr. Johnson and I talked it over, and Mr. Johnson talked as though he was not going to pay out seven per cent for money very long, and that he had the idea in his mind of refinancing the property. I said: 'You will probably do that before very long anyway and even though this is payable monthly, I don't know that it will make much difference,' and Mr. Johnson said: 'I don't think so because I am not going to pay seven per cent for money very long.'

"Q. He agreed to it?

"A. Yes, sir.

"Q. Did he give you that in writing?

"A. No, sir.

"Q. Isn't it a fact that in your presence there at this interview, or at a prior interview, Mr. Johnson figured what it would cost him in the loss of interest to make monthly payments instead of semi-annual payments?

"A. I never saw it.

"Q. You never saw it?

"A. No.

"Q. Did he tell you previously how much more money he would have to pay?

"A. He said it would amount to some difference but he didn't expect to carry it long."

Yet the direct and circumstantial evidence in the case is in direct conflict with this statement of Vandenbergh. In his statement he cannot definitely state that anyone was present except Johnson and himself. Perhaps Mears was present, but Mears does not testify on the subject. Possibly Johnson's son, but he was out of the State at the time of the trial. The whole testimony in the case, as well that for the plaintiff as that for the defendant, shows that the sale fell through because of the difference between the parties as to the rebates of rents, and monthly payment of interest and sinking fund. Dr. Hogue insisted on the contract as written, while Johnson insisted on the terms as represented by the brokers who were acting as agents for the owners. Johnson says he refused to take the property "because of the rebates of the rents and also because interest was to be paid every thirty days instead of semi-annually," and that he never waived "either of those provisions." He also says that Vandenbergh admitted that he had represented to the witness that the interest was payable semi-annually. Conferences

over these matters were held on December 12th, 13th, and 14th, at most of which Vandenbergh was present. It is not clear from the statement of Vandenbergh on which of these days Johnson made the waiver referred to by him, though he says it was "perhaps the day after, or the second day after this contract was signed by Dr. Hogue," which would place it on the 13th or 14th. But it is very certain that Vandenbergh never mentioned it to Dr. Hogue or any one else, although it was the bone over which the parties to the contract were contending and the main item which separated them. Mr. Shultice, who was counsel for Johnson, was called as a witness by the plaintiffs, and testified that he was present at a conference held on December 12th, the day the acceptance was signed by Dr. Hogue, at which Vandenbergh was present, and that the question of the times of payment of interest came up and was discussed at considerable length and a statement was made up showing the differences in paying the interest according to the deed of trust, or "paying it as Mr. Johnson had supposed it was to be paid," and that the amount was between $2,000.00 and $3,000.00. The question of the monthly payment of interest became a subject of controversy the very day the acceptance was signed. This same witness testified that the question of the interest falling due monthly was discussed at the meeting held on the 12th at great length, probably from an hour and a half to two hours, and that "Mr. Johnson refused to stand the deal with that additional burden added to it." Starke, counsel for Dr. Hogue, was also present at the conference on December 12th, when Vandenbergh was also present. Referring to the question of monthly payments of interest and sinking fund, the witness testified as follows:

"A. Mr. Johnson said that was totally different from his understanding and very expensive because he said if he could collect the rent month by month and pay the curtail at the end of the year, and pay interest every six months, he could use his money and in the meantime save a great deal of interest, whereas if some-one else was going to take one-*twelfth* of the total year's requirements each month that they would be taking in January a curtail due to be made a year from then, and he figured that it would cost him several thousand dollars in interest. He said he would not stand for that.

"Q. That was Mr. Johnson?

"A. Yes, sir.

"Q. Will you please state whether anything at that time was said by Mr. Johnson as to any representation that was made to him on that subject by Mr. Vandenbergh?

"A. Yes.

"Q. What was it?

"A. Mr. Johnson said in the meeting—first he said: 'I have heard nothing about these rebates,' and then he said: 'I have been told that the building all rented would rent for about $24,000.00 and that there are four vacancies.' It developed that there were five, but he agreed to absorb that. He said: 'I was told that interest was payable semi-annually and the curtail payable annually,' and he turned to Mr. Vandenbergh and said: 'You know you told me that, Mr. Vandenbergh.' My recollection is that Mr. Vandenbergh nodded and said something, 'Yes,' to that effect, and Mr. Johnson said: 'I will not stand for that situation. Somebody has got to pay me for the loss I will take by this interest, and somebody has got to pay me for these rebates. I don't like that rebate situation anyhow.' Then Dr. Hogue was to go off and find out what he could do with

Morton Hecht, and Dr. Hogue said: 'I want this matter closed at once,' and Mr. Johnson said: 'Well, if we can get together on these points, then Mr. Shultice has got to examine the title.' Dr. Hogue said: 'I want it closed by the 20th.' That was the 12th. Mr. Shultice said: 'I will use reasonable diligence, but I won't say I will close it in ten days,' and there were at times some high words as to whether Mr. Shultice could in ten days. We then parted with that attitude, and Dr. Hogue was still insisting, 'You shall take the property, and I want it closed in ten days if possible, but I am not going to stand for the loss on account of the interest payable monthly, nor am I going to stand for these rebates.'

"Q. That was said in the presence of Mr. Johnson and Mr. Vandenbergh?

"A. Yes. He said: 'If the rental agents have told you differently it is up to them.' I am frank to state there that Mr. Vandenbergh said once: 'He told me he would rebate the rent.' ·

"Q. Did he deny that?

"A. No. He said he had known nothing about the monthly payments, and Dr. Hogue said, 'You did know about them.' There was a conflict there. Dr. Hogue said: 'I insist that you take the property as Mr. Johnson has signed the contract.' Mr. Johnson said: 'I insist upon your conveying the property but I am going to take it as it was represented to me.' Mr. Johnson wrote out a check and said: 'Here is the $2,000.00 check we were talking about.' Dr. Hogue said: 'I will not take it until there is a definite understanding that I am selling only on the terms I agreed.' "

Dr. Hogue also testified that he was present at the various conferences referred to and that Johnson objected to taking the property on account of the monthly installments and the rebate of the rents.

On December 14th Johnson withdrew from the conference and addressed the following letter to the Buckingham Apartment Corporation:

"December 14, 1922.
"Buckingham Apartments Corporation,
   "R. C. Hogue, President,
      "City.
"Gentlemen:

"After repeated interviews, I find that you are not going to be able to transfer that property known as the Buckingham apartments to me, in accordance with your contract, and I decline to accept it in any other way. I see no reason why we should continue to discuss impossibilities, and I therefore request you to return my check for two thousand dollars ($2,000.00).

"Yours truly,
"(Signed) J. Johnson."

[4] The conceded misrepresentation as to the monthly payments of interest and sinking fund, the consistent conduct of Johnson in refusing to make such payments, or to accept the rebate of rents, the knowledge of Vandenbergh of Johnson's position and his failure to mention to anyone the alleged waiver by Johnson of his objection to monthly payments of interest and sinking fund, and the whole setting of the case as disclosed by the evidence, leave no doubt on the mind of the court that, on this vital point in the case, the verdict of the jury is plainly contrary to the evidence, and that the trial court committed no error in setting it aside and entering judgment for the defendant.

[5] If Dr. Hogue agreed to take care of the rebates, and Johnson waived his objection to the monthly payments of interest and sinking fund, there were no longer any points of difference between the parties, and the sale would have been completed at once. But the deal

fell through because the parties were unable to agree on these vital points. If the waiver attributed to Johnson by Vandenbergh was made, it is inconceivable that the fact should not have been mentioned at any of the numerous conferences held on the subject, or that Johnson should not have been confronted with his agreement. Such a waiver is contradicted by every fact and circumstance of the case.

[6] Perhaps on a demurrer to the evidence by the defendant, we might be compelled to accept Vandenbergh's statement of the waiver by Johnson, but not so under our present statute (Code sections 6251 and 6363), when to do so would strain the credulity of the court to the breaking point, and require the entry of a judgment contradicted by every other fact and circumstance of the case, in conflict with the testimony of numerous witnesses of high character, and manifestly against right and justice. It is extreme cases of this sort that the statute was enacted to meet.

[7] Upon the evidence in this case, it is very plain that the Buckingham Apartment Corporation could not successfully maintain against Johnson either a suit for specific performance, or an action for damages, and the plaintiffs cannot be allowed a recovery for securing a contract which is unenforceable by reason of their misrepresentations, however innocently made.

The plaintiffs never produced a purchaser ready, able and willing to purchase on the owner's terms. These misrepresentations were innocent and natural under the circumstances, but they materially affected the rights of the purchaser and hence defeated the enforcement of the contract.

The judgment of the circuit court will be affirmed.

*Affirmed.*