# Richmond.

## The Chesapeake and Ohio Railway Company v. B. W. Palmer.

### December 22, 1927.

1. Appeal and Error—*Successive Trials—First Verdict Set Aside— Refusal to Set Aside Second Verdict—Appellate Court Confirming First Verdict without Examining Proceedings on Second Trial.*— Where there are two trials of a case and the court on the first trial sets aside a verdict in favor of plaintiff and orders a new trial, and on the second trial plaintiff again recovers a verdict and defendant's motion to set aside the second verdict is overruled, and defendant obtains a writ of error, the appellate court looks to the first trial. Should the court upon an inspection of the record there be of opinion that the first verdict should have been confirmed, it will so order, and not undertake to examine the proceedings of the second trial at all. On the other hand, should it appear that the first verdict was properly set aside by the trial court, it becomes necessary as a matter of course to examine the second record.

2. Appeal and Error—*Distinction between Verdict Approved by the Trial Judge and Verdict Disapproved by the Trial Judge.*—A distinction obtains between verdicts approved by the trial judge and those disapproved by him. The first is taken by the appellate court as on a demurrer to evidence. In the latter case the rule is substantially more liberal.

3. Workmen's Compensation Act—*Section 12, as Amended by Acts of 1920, page 256—Subrogation of Employer to Rights of Employee.*—The Virginia workmen's compensation act, section 12, as amended by Acts of 1920, page 256, subrogating the employer to the rights of the employee was not enacted for the benefit of the negligent third party; he has slight interest in it.

4. Statutes—*Construction—Purpose of the Legislature—Purpose of Workmen's Compensation Act.*—Into the construction of every act must be read the purpose of the legislature, and the underlying purpose of the workmen's compensation act was to give relief to workmen.

5. Workmen's Compensation Act—*Section 12, as Amended by Acts of 1920, page 256.*—Under section 12 of the workmen's compensation act, in the original act of 1918 it was possible for the employee to

obtain an award from his employer and also to sue the wrongdoer, a third party, and thus duplicate his recovery and secure damages from two sources. To remedy this situation Acts of 1920, page 256, amending section 12, gave to the employer the right to recover from the wrongdoer whatever he had actually had to pay, and it took from the employee the right *pro tanto* to a double recovery, but beyond this it left the employeee's right to recover as it was before.

6. Workmen's Compensation Act—*Subrogation—Section 12, as Amended by Acts of 1920, page 256.*—Section 12 of the workmen's compensation act, as amended by Acts of 1920, page 256, merely subrogates the insurance carrier to the rights of the employer. Such as they are it takes, and it takes neither more nor less.

7. Workmen's Compensation Act—*Subrogation of Insurance Carrier— Contract by Independent Contractor to Save Railroad Harmless—Case at Bar.*—The instant case was an action against a railroad company to recover for injuries to an employee of an independent contractor. The action was brought in the name of the employee and an insurance carrier who had paid the employee compensation, under the workmen's compensation act, section 12, as amended by Acts of 1920, page 256. There was a contract between the railroad and the independent contractor under which the independent contractor was to save harmless the railroad from any damages arising from injuries to mechanics, laborers or other persons by reason of accidents or otherwise.

*Held:* That in this action the contract under which the independent contractor agreed to save the railroad harmless need not be considered. The contractor and wrongdoer could not by private agreement deprive the employee of his major remedy, and make him bear the burden of an agreement that the contractor would save the railway harmless.

8. Appeal and Error—*Assignments of Error—Improper Admission of Evidence—Case at Bar.*—On error from a judgment for plaintiff in an action to recover for personal injuries, assignments of error by defendant which deal with the improper admission of evidence, the argument of plaintiff's counsel, the doctrine of last clear chance, the changes in the locomotive after the accident, and the suggestion that if a recovery is permitted it should be limited to damages assessed under the compensation act, need not be considered, if there could in no event be a recovery.

9. Appeal and Error—*Points to be Considered by Appellate Court when Case is Decided on its Merits.*—It is the duty of the court to pass upon matters affected with a public interest or of moment to the profession; beyond this it is usually well to do no more than is clearly necessary where a case is to be decided upon its merit and when a final judgment is to be entered.

10. Railroads—*Negligence—Employee of Independent Contractor—Licensees—Trespassers—Case at Bar.*—In the instant case, an action for personal injuries, plaintiff was the employee of an independent contractor, doing certain work in the yards of a railroad. Plaintiff alleged that he was struck and injured while crossing the track to get a drink of water, as was his custom and the custom of other members of his gang. When struck, plaintiff was not going towards the water plug but had practically passed it. Plaintiff could give no satisfactory reason for his presence at the point of the accident.

    *Held:* That if plaintiff was going in an ordinary manner to get a drink of water, he should be treated as a licensee; but if he was simply wandering in the yard when hurt, he was a trespasser, or, at the most, a bare licensee.

11. Railroads—*Duty of Railroads—Licensees—Bare Licensees—Case at Bar.*—The instant case was an action by an employee of an independent contractor for injuries received while at work in a railroad yard. Plaintiff alleged that when struck by defendant's engine he was crossing the tracks to get a drink of water, as was his custom and the custom of others of his gang. If plaintiff was a licensee, the railroad owed him the duty of keeping a reasonable lookout, although there was to him due no duty of pervision, and of course it did not owe him any such duty if he was a bare licensee. In the latter case he was merely relieved from the responsibility of being a trespasser, and took upon himself all the ordinary risks which attached to the place and business carried on there.

12. Railroads—*Lookout—Engineer not Required to Assume a Position in which the Engine would have been Out of His Control.*—It is the imperative duty of an engineer to keep his engine under control, and only some extraordinary emergency would justify an engineer in assuming a position where this could not be done. An engineer is not required to assume a position in which he would lose control of his engine in order to keep a reasonable lookout.

13. Railroads—*Injuries to Persons On or Near Tracks—Lookout—Case at Bar.*—The instant case was an action for personal injuries by the employee of an independent contractor engaged on work in a railroad yard. The accident occurred when plaintiff was struck by a backing engine when crossing the tracks, as he alleged, to get a drink of water. There was a verdict and judgment for plaintiff. An examination of the evidence from the standpoint of a demurrer thereto led to the inevitable conclusion that the engine driver in the exercise of reasonable care and keeping a reasonable lookout could not have seen plaintiff at all during the period of his peril, and that plaintiff had shown no negligence on the part of the defendant.

    *Held:* That a judgment for plaintiff would be set aside and the case dismissed.

14. Railroads—*Evidence—Opinion Evidence—Distance an Object Could be Seen—Case at Bar.*—The instant case was an action against a railroad for personal injuries. Witnesses for plaintiff undertook to say from their general knowledge what distance an object could be seen from the engine which struck plaintiff without accurate information of its character.

*Held:* That this was nothing more than opinion evidence and its admission constituted error.

Error to a judgment of the Circuit Court of the city of Richmond, in a proceeding by motion for a judgment for damages. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*D. H. Leake* and *Leake & Spicer*, for the plaintiff in error.

*Sinnott, May & Leaman*, for the defendant in error.

Holt, J., delivered the opinion of the court.

This is an action by motion to recover damages for injuries suffered by the defendant in error, B. W. Palmer. There was a verdict and judgment for the plaintiff. To this a writ of error has been obtained.

Brooks-Calloway Company, an independent contractor, undertook to do certain work for the Chesapeake and Ohio Railway Company in and about its yards at Clifton Forge, Virginia. This work was quite extensive. Palmer, prior to the date of his injuries, had been employed by that construction company for a period of about two weeks. He was a member of what was known as the "mud track" gang, which consisted of eight men who worked on a tract at the extreme south or Jackson River side of the yard. On

the morning of the accident, and at about nine o'clock on November 2, 1923, he was engaged in dumping mud near the "point of clearance" shown upon the blue print, which is incorporated into this opinion. Some distance across the yard at approximately one hundred and fifteen feet was a water plug sometimes called a "water column." The morning was clear and cold. He started across the intervening tracks to this "water column" to get a drink of water, as was his custom. Other members of his gang were in the habit of doing the same thing. When he reached that next to the water column, and at a point approximately forty feet east thereof, it may have been a few feet less, he stumbled on the south rail, fell and in doing so was stunned. He saw an engine approaching, but owing to his dazed condition, was not able to remove himself from the place of danger. He did, however, succeed in dragging his body across the north rail. While engaged in this attempt the engine ran over and cut off both his legs, and that accident is the foundation of this action. There were two trials. The first, had in June 1925, resulted in a verdict in favor of the plaintiff in the sum of fifteen thousand dollars ($15,-000.00). On motion of the defendant the trial court set it aside as contrary to the law and evidence, and ordered a new trial, to which action of the court the plaintiff duly excepted. In June 1926, another trial was had, which resulted also in a verdict for the plaintiff. The recovery in this instance being twelve thousand five hundred dollars ($12,500.00). The defendant moved to set it aside. This motion was overruled, and judgment for said sum entered. It is to this that a writ of error was obtained.

[1] In such circumstances we look to the first trial. Should the court upon an inspection of the record

there be of opinion that the first verdict should have been confirmed, it will so order, and not undertake to examine the proceedings of the second trial at all. On the other hand, should it appear that the first verdict was properly set aside by the trial court, it becomes necessary as a matter of course to examine the second record.

For reasons which will be hereafter stated we are of opinion that there was no error in the action of the trial court in the first instance, and so without examining that record in detail, will take up the last case first.    This is done as a matter of convenience for the major questions are the same, the evidence is more elaborate and the facts were more fully developed at the second hearing.

[2] It is not out of place here to note the distinction that obtains between verdicts approved by the trial judge and those disapproved by him.    The first is taken by the appellate court as on a demurrer to evidence.    In the latter case the rule is substantially more liberal.    *Vandenbergh* v. *Buckingham Corp.*, 142 Va. 397, 128 S. E. 561.

Palmer was an employee of Brooks-Calloway Company.    He elected to apply for compensation under the workmen's compensation act, and was awarded a recovery of nine dollars ($9.00) a week for five hundred weeks from November 2, 1923, the date of the accident.

The contract between Brooks-Calloway Company and the railway contains among other things this stipulation:

"In all operations connected with the work embraced in this contract the contractor will be held responsible for any failure to respect, adhere to, and comply with all local ordinances and laws controlling or limiting in any way the actions of those engaged upon the work, or

affecting the materials or the transportation or disposition of them.   And the contractor hereby assumes all liability for, and agrees to indemnify the company against all loss, cost or damage, for any liens, claims for materials or from laborers, mechanics and others, and from any damages arising from injuries sustained by mechanics, laborers or other persons by reason of accidents or otherwise, and from damages sustained by depositing materials to public injury, or of any person or corporation, including cost and expenses of defense, provided that he be duly notified of the bringing of suits in such cases, and be permitted to defend the same by his own counsel.''

For the railway it is said that Palmer had no right to bring this action at all because of the express provision of the statute, and that the Casualty Company which brought it in his name and for their joint benefit had only such rights as Brooks-Calloway Company had under whom it held by subrogation.   This company it is said was under contract to hold the railway harmless and could not itself have instituted any such litigation, in short, that it could not sue one it had contracted not to sue, and that Palmer's rights could rise no higher than those of the construction company which held them by statutory assignment.

The Virginia workmen's compensation act is thus brought under review and section 12 in particular. This section appears in a foot note.

"The rights and remedies herein granted to an employee where he and his employer have accepted the provisions of this act respectively to pay and accept compensation on account of personal injury or death by accident shall exclude all other rights and remedies of such employee, his personal representative, parents, dependents or next of kin, at common law or otherwise on account of such injury, loss of service or death.

"The making of a lawful claim against an employer for compensation under this act for the injury or death of his employee shall operate as an assignment to the employer of any right to recover damages which the

In principle the matter here suggested has already
been passed upon by this court, and requires no elabo-
rate consideration. *Southern Railway Company* v. *U.
S. Casualty Company*, 136 Va. 475, 118 S. E. 266,
presents facts strikingly like the case at bar except
that there was no undertaking on the part of the em-
ployer to save the defendant harmless. It was said
in a statement of the facts that:

"At the time of the accident S. E. Moorefield, an
employee of L. D. Moorefield, doing business as Pure
Food Bakery, acting within the scope of his employ-
ment, was driving an automobile truck, belonging to
L. D. Moorefield, over the Henry street crossing of the
defendant's railroad in the city of Danville, Virginia.
L. D. Moorefield carried a workmen's compensation
insurance policy with the plaintiff. The plaintiff, as

injured employee or his personal representative or other person may have
against any other party for such injury or death, and such employer shall
be subrogated to any such right and may enforce, in his own name or in the
name of the injured employee or his personal representative, the legal
liability of such other party. The amount of compensation paid by the
employer or the amount of compensation to which the injured employee or
his dependents are entitled shall not be admissible as evidence in any action
brought to recover damages, but any amount collected by the employer
under the provisions of the section in excess of the amount paid by the
employer or for which he is liable shall be held by the employer for the
benefit of the injured employee or other person entitled thereto, less such
amounts as are paid by the employer for reasonable expenses and attorney's
fees. Provided, that no compromise settlement shall be made by the
employer or insurance carrier in the exercise of such right of subrogation
without the approval of the Industrial Commission and the injured employee
or the personal representative or dependents of the deceased employee
being first had and obtained.

"Where any employer is insured against liability for compensation with
any insurance carrier, and such insurance carrier shall have paid any com-
pensation for which the employer is liable or shall have assumed the lia-
bility of the employer therefor, it shall be subrogated to all the rights and
duties of the employer, and may enforce any such rights in its own name or
in the name of the injured employee or his or her personal representative,
provided, however, nothing herein shall be construed as conferring upon
insurance carriers any other or further rights than those existing in the
employer at the time of the injury to his employee, anything in the policy of
insurance to the contrary notwithstanding." Virginia Acts of Assembly
1920, page 256.

such insurance carrier, having assumed the liability of the employer therefor, paid S. E. Moorefield the compensation due under the policy on account of his injuries, and claims to be subrogated to the rights of the employer in the premises."

The court in its opinion observed:

"We dissent from the contention of the defendant that under the provision of the statute just quoted the employer, at the time of the injury to the employee, had no rights which could be asserted and that, therefore, the plaintiff here is undertaking to assert a right not vested in it by statute."

And held that:

"At the time of injury to the employee, the employer had the right, upon the making of a lawful claim by the employee against the employer for compensation under the act, to recover such damages as the injured employee might have recovered against any other party for such damages. Upon the making of such claim, the employer's rights as assignee of the employee relate back and are the same as those of the employee at the time of the injury."

This statute again came under consideration in *Smith* v. *Va. Ry. & Power Co.*, 144 Va. 169, 131 S. E. 440. There Stratton was the motorman of a street car. Smith negligently drove an automobile against and injured him. Stratton under the workmen's compensation act was awarded damages against the street car company and was paid by it. He then brought an action in his own name against Smith, and was allowed to amend his notice by inserting as plaintiff "Virginia Railway and Power Company, who sues in the name of Willie Lee Stratton." Against this amendment Smith protested.

The court said:

"(1) The contention is that Stratton could not maintain the action because of the first clause of section twelve of the act, hereinbefore quoted. That clause, however, refers only to the remedy of an employee against his employer, and it is only his right to sue his employer for damages which is barred by the acceptance of compensation under the act. No argument to support this conclusion is necessary, as it seems to us, because he who runs may read it in the statute.

"The next clause of the section quoted refers to an entirely different right, and subrogates the employer who has paid compensation to his employee under the act to the right to enforce any legal liability against such other party as may be liable in damages for the injury. The employer is not only subrogated to any such right of the employee to enforce any such legal liability against another, but the statute in express terms provides that he may enforce it 'in his own name or in the name of the injured employee, or his personal representative.' "

And again:

"We observe that the Nebraska court, in *Muncaster v. Graham Ice Cream Co.*, 103 Neb. 381, 172 N. W. 52, in upholding the right of the injured employee to maintain an action against a third party, says: 'Evidently the intent of the legislature was not to limit an employee to the recovery only of the workmen's compensation act; but when, as a matter of justice, the employee was entitled to recover a greater compensation than is provided for in the act, then he had the right to proceed under the provisions of section 3659 (Rev. St. 1913) and to recover as much as a jury would warrant for his damages and injuries, and after so recovering, to deduct therefrom the necessary expenses which his employer had been to, in paying out under

the provisions of the act.'   In *Thomas* v. *Otis Elevator Co.*, 103 Neb. 401, 172 N. W. 53, the court said this: 'The first complaint made is that the plaintiff had no right to bring the action in his own name under section 3659, Rev. St. 1913.   In *Muncaster* v. *Graham Ice Cream Co.* (103 Neb. 379, 172 N. W. 52) it was decided that the statute did not take away the right of the employee to recover damages against a third person when the relation of master and servant does not exist; that the section was designed for the protection of an employer who had paid the compensation; that, if the employer's rights were protected, it was no concern of the negligent third party.

[3] "The statute subrogating the employer to the rights of the employee was not enacted for the benefit of the negligent third party; *he has slight interest* in it. He remains liable for the entire amount of such damages as may be lawfully recovered of him.   The most that he could possibly claim is that after judgment he would be interested in having the proper apportionment made between the employer who has paid the compensation and the employee, if the recovery against him should exceed the amount paid to such employee under the compensation act."   (Italics supplied.)

The instant case differs only in that we have in it an insurance carrier, who is subrogated to the rights of the contractor, and whose rights are measured by its.

*State* v. *N. Y. P. & N. R. Co.*, 141 Md. 305, 118 Atl. 795, is also in point.   The facts there as stated by the court are:

"The State Industrial Accident Commission, on January 25, 1921, ordered that George U. McAllen, employer, and the State Accident Fund, insurer, pay certain weekly amounts to Rachel Johnson, the widow and sole dependent of Frank M. Johnson, as com-

pensation for his death from an injury which arose out
of and in the course of his employment.   The accident
which resulted in Johnson's death occurred while he
was employed by McAllen in loading mine props on
cars by means of a derrick erected and operated on the
property of the New York, Philadelphia and Norfolk
Railroad Company by its permission.   It is the purpose
of this suit by the State, for the use of the State Acci-
dent Fund and Rachel Johnson, to recover damages
from the railroad company· under section 58 of the
workmen's compensation act (Code art. 101) on the
ground that Johnson was killed by an electric current
with which a chain on the derrick he was operating
became charged from an uninsulated wire, conveying
electricity of high and deadly voltage, alleged to have
been negligently maintained by the company in dan-
gerous proximity to the derrick and without notice of
the peril thus created."

Substantially the same defenses were made there that
are made here.   They are considered in detail, and the
court said:

"The suit, moreover, is for the benefit of the depend-
ent widow as well as for the insurer, and, as already
suggested, the agreement relied upon could not possibly
impair the widow's right to sue the defendant under
the conditions which the act prescribed.   To the
extent of any amount recovered in excess of that
required to reimburse the State Accident Fund, the
widow has a substantial interest in the litigation, and
this in itself would be a sufficient reason for holding
that the agreement pleaded by the defendant should
not be treated as an effective bar to the action.   In
our opinion the demurrer to the special plea should
have been sustained."

[4] Into the construction of every act must be read

the purpose of the legislature, and that underlying purpose in this instance was to give relief to workmen. This relief in the nature of things had to be charged against the employer. Section 12 in the original act of 1918 (Acts 1918, c. 400) consisted only of what is now the first paragraph of that section as amended by the Acts of 1920. It said that an employee who had received compensation under this act from his employer should not thereafter sue him—a declaration manifestly just.

[5] It soon became apparent that an employer might be mulct in compensation who was no wise at fault. The right of the employee to sue the wrongdoer had not been affected, and it was then possible for him to duplicate his recovery and to secure damages from two sources. Such a situation called for relief, it was given in the amendment in 1920, and written into the second paragraph of section 12. It gave to the employer the right to recover from the wrongdoer whatever he had actually had to pay, and it took from the employee the right *pro tanto* to a double recovery, but beyond this it left the employee's right to recover as it was before.

[6, 7] For convenience, and for the protection of the employer and for the proper distribution of the recovery, it provided that one action should be brought and that by the employer. All this was for his benefit, and if he does not care to avail himself of it, well and good, but he cannot in such manner shut out the employee. It would be unlooked for and curious if the contractor and wrongdoer could by private agreement deprive him of his major remedy, and make him (Palmer) bear the burden of an agreement on the part of Brooks-Calloway Company that it would save the railway harmless.

The third paragraph of section 12 as amended merely

subrogates the insurance carrier to the rights of the contractor. Such as they are it takes and it takes neither more nor less.

The purpose of these amendments and their only purpose was to put the saddle on the right horse.

In this action we need not concern ourselves with the rights which flow from the contract under which Brooks-Calloway Company agreed to hold the railway harmless. That may be the subject of independent litigation. As to it we express no opinion at all. It is interesting to note, however, that the construction of this agreement is already a subject of controversy by counsel. On this branch of the case we hold, and all that we hold, is that there is nothing in the workmen's compensation act to prevent the prosecution of this motion, and the enforcement of the judgment of the court below.

[8, 9] The assignments of error which deal with the improper admission of evidence need not be considered, if, with the objectionable testimony in, there can in no event be a recovery. So also as to the argument of plaintiff's counsel charged to be objectionable, the doctrine of the last clear chance, the changes made in the locomotive after the accident, and the suggestion that if a recovery is permitted at all, it should be limited to damages assessed under the compensation act. It is the duty of the court to pass upon matters affected with a public interest or of moment to the profession, beyond this it is usually well to do no more than is clearly necessary where a case is to be decided upon its merit and when a final judgment is to be entered. At best it takes a stout heart to read all that has to be written, and little is to be gained by continually re-threshing old straw.

The major difficulties arise out of a consideration of

the evidence vouched to sustain the second verdict. Is it sufficient to do this?

Of course we are to bear in mind the familiar rule that a verdict approved by the trial judge comes to us practically as on a demurrer to the evidence, and so in the statement of those facts deemed material wherever there is conflict we have adopted the version of the plaintiff's witnesses. The "water column" to which Palmer was accustomed to go for water was one hundred and fifteen (115) feet from the point at which he was working on the morning of the accident. As has been seen, he slipped on the south rail and was crawling across the north one of the track immediately adjacent to this "water column" when the tender and engine ran over and cut off his legs.

This locomotive when first seen was about four hundred feet distant towards the east. At the time he fell it was three hundred or three hundred and fifty feet away, and appeared to be traveling at the rate of seven or eight miles an hour. It was executing a yard movement in the ordinary course of business, and in charge of one man, a hostler, as is the custom in standard railroads. This hostler by reason of death did not testify.

Plaintiff's testimony gives no satisfactory reason for his presence at the point of accident. He was probably forty, and certainly not less than twenty, feet east of the water plug when hurt, and was crossing the track used by engines in taking water therefrom. He certainly was not at that time going towards it, and had practically passed it. It may be that he was going to a fire to warm himself, as the defendant's evidence suggests, but whether that be true or not he was out of place.

[10, 11] If he was going in an ordinary manner and

in an ordinary way to get a drink of water, he should be treated as a licensee, and if he was not doing this but was simply wandering in the yard when hurt, he was a trespasser or at the most a bare licensee. In the first instance the railroad would have owed him the duty of keeping a reasonable lookout, although there was to him due no duty of prevision, and of course it did not owe him any such duty if he was a bare licensee. In the latter case he was merely relieved from the responsibility of being a trespasser, and took upon himself all the ordinary risks which attached to the place and business carried on there. *Norfolk & Western Ry. Co.* v. *Stegall,* 105 Va. 538, 54 S. E. 19; *Norfolk & Western Ry. Co.* v. *Denny,* 106 Va. 383, 56 S. E. 321; *Chesapeake and Ohio Ry. Co.* v. *Saunders,* 116, Va. 826, 83 S. E. 374; *Washington and Old Dominion Co.* v. *Ward,* 119 Va. 334, 89 S. E. 140.

In instruction 2 given for the plaintiff the trial court told the jury that if they believed that the employees of Brooks-Calloway Company were accustomed to cross the tracks of the railway going to the water plug, with its expressed or implied consent, it was the railway's duty to keep a reasonable lookout. In defendant's instruction No. 10 the court told it that the railroad did not owe Palmer the duty of any special lookout, nor did it owe to him the duty of having more than one person upon its engine, and this was repeated in instruction No. 11 in which the jury was also told that defendant was not required to give any signals of approach, or to run its train in any particular manner. These instructions told the jury and it is the law that at the utmost the only duty the railroad owed Palmer was to keep a reasonable lookout. When Palmer first saw the engine it was not on the track where the accident occurred, but was on a track connected with

it and with a number of parallel tracks by switches. That is to say these parallel tracks ran into this general track which fed them through switches and at an angle of twelve degrees. The engineer sits on the right hand side of the cab looking forward. In the instant case the engine was headed east with its tender behind it, and, of course, towards the west. It was backing west, and the locomotive driver, or hostler in charge, who was in the engineer's seat, was on the right hand side of the engine looking east, but was on its left hand side measured by the direction in which it was then going. The tender in the rear was too tall for him to see over. He had to look around it, and so as a physical fact he could not see the track on which Palmer lay until he had swung from the feeder or ladder track and straightened out on it. This engine and tender was one of old type. After the accident some changes were made which increased the locomotive driver's field of vision.

Col. Duke made certain experiments for the plaintiff after the changes were made, and on a straightaway track. In doing so he took two positions. The first is described as an upright one. Evidence as to it is:

"Q. In the other positions which you assume and you said were upright, was your head out of the window?

"A. Yes, looking down the track. For instance, if you would sit in any window, whether a locomotive or not, sit about like that (indicating) with your arm on the window sill.

"Q. Your head out of the window some distance?

"A. I don't know how far out it was.

"Q. It was some distance?

"A. Bound to be out some distance.

"Q. In other words, the tender back there obscures the view if you look straight forward, does it not—the tender of the engine?

"A. The top of it does but the side does not."

This is the evidence as to the other position taken by this witness:

"Q. The first set of figures you gave us, you say, when you were leaning out about as far as you could and looking to see what you could see?

"A. Yes; because he walked down the track and asked me to signal him when he disappeared from view.

"Q. You were leaning pretty near as far out as you could well do, weren't you?

"A. Not as far as I could have leaned, no.

"Q. Pretty near, wasn't it?

"A. Well, an inch or two I could have leaned maybe.

"Q. Your hand was on the throttle then?

"A. Yes, sir.

"Q. Could you operate the throttle?

"A. I never operated a throttle in my life. I have seen engineers operate them; I have ridden on locomotives and seen them do it, but I didn't attempt to do that.

"Q. I suppose you have operated throttles on machine guns but not on locomotives?

"A. Yes.

"Q. You don't know whether an engineer could have operated the throttle in the position which you then assumed, pearing out of the window, do you?

"A. No; I am not an engineer."

The result of the first series of observations by Col. Duke he states to be:

"That is, this was in practically an upright position, 164 feet, with a person lying across the rails. You lay across the rails and I could see you, could observe the feet and ankles and part of your legs at that distance. In the same position I observed a person inside the

tracks near the south rail, that is close up to the south rail, 153 feet, and the distance of 153 feet I saw this person walking in the middle of the track."

In the second position, his evidence is that he could see forty-nine and eight-tenths feet ahead.

Mr. Hinebaugh also made certain experiments with this engine before the tender was changed. He states:

"Tests were made with the engine headed on a straight line. Mr. Kean walked down the track a distance of 400 feet from me on the south side of the track and didn't come into view at any point between the engine and 400 feet, walking from me. He came across the track and I observed him walking across the track as he neared the north rail at that time."

"Q. What distance then did he come into view?

"A. He was 400 feet from me at the time he started across the track. He walked back near the north rail and I saw him at a distance of about 200 feet." The engine was headed west when this experiment was made.

After this tender was changed, and at the same time that Col. Duke made his experiment, this witness again made observations under new conditions. These are the results thereof:

"Q. Straight track?

"A. Yes, sir; straight track. With a man standing on the inside of the south rail—that was on the south side of the engine—a man standing on the inside of the south rail, I could see him 195 feet; in the middle of the track I could see him 268 feet; on the north rail, standing on the north rail, or straddling the north rail, I could see him in a distance of 400 feet.

"Q. Could you see inside of those distances?

"A. No, sir; not visible inside of those distances.

A man lying in the track with his feet projecting over the south rail, I saw him at a distance of 217 feet. I could only see his feet and I could not have been positive then as to what the object was. I had considerable advantage in getting in view of the north rail this time that I did not have in June, 1925. At 400 feet in 1925, I could get no view of the opposite rail at all, at a distance of 400 feet. After the tank had been modernized I could see the north rail at a distance of 400 feet.

"Q. What was that due to?

"A. To removing the side boards; that gave a better view of the north side, or the opposite side of the track."

Col. Duke also testified that an object on the track now visible forty-nine and eight-tenths feet ahead could have been seen 100 feet distant before these changes were made. Of course, these changes were made on the tender, and only affected the view when the engine was backing.

[12] The evidence shows that an engineer in the position of Col. Duke at the time of the second experiment would have been out of control of his engine, and this is not required of an engineer or of any reasonable lookout. Suppose in such circumstances he had been confronted with an emergency and an accident had occurred: How could the road defend? It would be told that it was its imperative duty to keep its engine under control, and that only some extraordinary emergency would justify the driver in assuming a position where this could not be done.

In the first position Col. Duke's testimony is that he leaned well out of the window, and that an object on his side of a straight-away track first became visible 153 feet away.

The evidence of Mr. Terry, draftsman and surveyor,

is that from the supposed point of accident to the end of the straight-away track is 118 feet, and that after then the track bears to the left at an angle of twelve degrees.    It is of necessity true that the view from an engine with a tender in the rear backing toward the point of accident is totally cut off until the tender has swung into the straight-away section of track.    This section, as we have seen, was 118 feet long, or, giving to opinion evidence the utmost latitude, the track was straight from the point of accident to the switch and for a distance of not more than 138 feet.    Col. Duke's testimony is that you could see on the near side of the track, when it was straight, an object 153 feet distant, which was further by fifteen feet than it would have been possible for the engineer to see, for the track was straight to the point of the accident for only 138 feet. As a matter of fact the length of the tender, twenty-four feet, should also be deducted which would place this point 114 feet away, and ninety-four feet away if the point of accident was forty feet east of the water plug.    All this is upon the theory that the tender changes had not enlarged the field of vision.    That it had is not in serious dispute.    Hinebaugh is the only witness who has testified as to distances before the changes.    His evidence is that on a straight-away track the view was cut off in all circumstances for two hundred feet and on the far side for four hundred.

[13] We, therefore, reach the conclusion that an examination of the evidence from the standpoint of a demurrer leads inevitably to this, the engine driver in the exercise of reasonable care and keeping a reasonable lookout could not have seen Palmer at all during the period of his peril.    All this is upon the theory that he was a licensee and entitled to the benefit of such lookout.

[14] Cross-assignments of error will be briefly considered. What has been said about the evidence at the last trial in the main applies to the first. Though it is not taken as on demurrer to the evidence. *Vandenbergh* v. *Buckingham Corp.*, 142 Va. 397, 128 S. E. 561, *supra.* We will not review it in detail, but content ourselves by saying that the trial judge was justified in setting the verdict aside. This action was also proper because of the erroneous admission of the testimony of witnesses Stutz and Green, who undertook to say from their general knowledge what distance an object could be seen from this engine without accurate information of its character. This was nothing more than an opinion evidence. Its admission constituted error, and was so recognized by the trial judge. *Virginian Railway Co.* v. *Andrews*, 118 Va. 482, 87 S. E. 577; *Virginia-Carolina Chemical Co.* v. *Knight*, 106 Va. 874, 56 S. E. 725; *Director General* v. *Souder*, 134 Va. 356, 114 S. E. 605. The wisdom of this rule is demonstrated here. This witness, Green, testified that an object could be seen on both sides of the track fifteen or twenty feet ahead. Col. Duke's evidence, based upon actual experiments, demonstrates that this was not only not true but nowhere near the truth. We may readily concede this man to be honest, but his opinion was worthless, and it was out of such cases that the rule grew.

The judgment cannot be changed or set aside because of any provisions of the workmen's compensation act.

It is contrary to the evidence; the plaintiff has shown no negligence on the part of the defendant, which contributed to the accident, and this he must, of course, do.

The action of the trial court in setting aside the first verdict was proper.

For the foregoing reasons the judgment must be set aside and the case dismissed.

*Reversed.*